Billy MOSLEY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.

Daro Realty, et al., Intervenors.

No. 88–1568.

District of Columbia Court of Appeals.

Submitted Nov. 20, 1989.
Decided April 25, 1990.

Kimberly L. Moore, Washington, D.C.,
was on the brief for petitioner.

Charles L. Reischel, Deputy Corp. Coun-
sel, Washington, D.C., filed memorandum
for respondent.

Richard W. Galiher, Jr., Rockville, Md.,
was on the brief for intervenors.

Before ROGERS, Chief Judge, and
FARRELL, Associate Judge, and
REILLY, Senior Judge.

REILLY, Senior Judge:

In this petition for review of an order of
the Department of Employment Services
(the agency) denying worker's compensa-
tion to Billy Mosley, an employee injured in
an apartment leased to him without rent by
his employer, we are urged to reverse such
order on the ground that the agency erred
in determining that the injury did not arise
out of or in the course of employment. *See*
D.C.Code § 36–301(12) (1988 Repl.). We
affirm.

I

The record shows that Mosley was hired
in April of 1987 by Daro Realty, which
manages several apartment buildings in
the city, as a maintenance porter at a nine-
story apartment house at 1600 16th Street,
N.W. His regular chores included clean-
ing, collecting and dumping the contents of
the trash cans placed in the corridors by
tenants, mopping and sweeping the halls
and laundry room. He was also called
upon by the property manager to supply
such services to the tenants as replacing
lighting fixtures, unclogging drains, repair-
ing broken windows and window cranks.
As he was not a craftsman, management
utilized outside contractors for more com-
plicated repair problems, *e.g.*, electrical wir-
ing, plumbing, or pipe fitting. Under his
schedule of hours, he worked from 8:00
a.m. to 4:00 p.m. on week days (except
Friday afternoons) and two hours each
morning on Saturdays and Sundays, start-
ing at 8:00 a.m. or 9:00 a.m.

Approximately two months after being
hired, Mosley who had been living else-
where, was offered an apartment on the
bottom floor of the premises rent-free. He

accepted and signed a lease. This instrument contained an addendum providing for the payment of $350 in monthly rent should he quit or his employment be otherwise terminated. In all other respects, the terms of the lease—a standard printed form—were identical to those agreed upon by other tenants in apartments operated by Daro Realty.

When testifying about this lease at the agency hearing, Mosley said that except for the rental conditions, his employer gave no explanation for its offer and that his only reason for accepting was because he "wanted an apartment by myself anyway." According to John Moncrief, the property manager, this arrangement was made so that there would be a maintenance man on the premises to help in emergencies if Moncrief was out of town, and in return for a free apartment, Mosley agreed to respond in case of an emergency after hours. He emphasized that Mosley was not supposed to be on call for twenty-four hours and that he was free to absent himself from his apartment without notifying management.

Early one Sunday morning in October—some six months after petitioner moved into the leased apartment—Moncrief was informed by the desk clerk that Mosley had just been transported to a hospital by an emergency ambulance sent to the building by the fire department, because he had apparently cut his hand on a window. Medical records show that Mosley had suffered a major laceration in the upper tendon of one arm which required surgery and resulted in partial impairment in the use of his right hand. Upon his discharge from the hospital a few days later, he returned to the apartment. He continued to occupy it without paying rent until the end of the year, although unable to resume work because of his arm injury.

In appearing at the hearing in support of his right to worker's compensation, Mosley's counsel presented his claim on the stated premise that the injury occurred during working hours in performing a task within the scope of his employment. According to Mosley's testimony, he had begun work on that particular Sunday morning before 7:00 a.m., had mopped the entrance hall, cleaned the laundry room, collected trash, and deposited it in the dumpster located in the backyard near the basement steps, when he noticed that a window in his apartment was partially open. Going back to his unit, he attempted to close the window which swung out a foot or two above ground, by pulling with one hand and using a screwdriver with the other.[1] While so engaged, the screwdriver slipped and he inadvertently thrust his arm through a pane where it remained impaled in broken glass until a cousin arrived and helped him remove the bleeding arm from the shattered window.[2] An ambulance was called and Mosley was taken to the hospital.

The claimant's testimony was contradicted on all major points by Moncrief when called to the stand by the employer. He told the hearing examiner that maintenance personnel were forbidden from reporting for work prior to 8:00 a.m., in order to avoid disturbing sleeping tenants. He also testified that Mosley performed no work on that particular morning as he had neither signed in nor picked up from the front desk the keys to the storage room where the trash bags were kept. No mopping or floor cleaning had been done.

As for the cause of the injury, Moncrief's inspection of the apartment indicated that the accident could not have happened as Mosley described. He found no screwdriver—but did discover two knives lying on the ground outside the window. According to Moncrief, from the contours of the hole in the glass, someone must have hit the window rather than pushed a hand against it.

1. The ordinary method of opening and closing windows of this type in the apartment building was to use a crank attached to the hinges. Mosley was familiar with these devices as he had replaced cranks for various tenants in the course of his duties and had access to the storage room where crank replacements were kept.

2. The claimant did not call the cousin or any other witness in his behalf.

## II

In her findings of fact, Hearing Examiner Karolyn Roebuck accepted Moncrief's testimony as "very credible" and rejected Mosley's version of events, noting that his injury occurred before he was required to report for work, and that he had not even begun work when it happened. She also found that claimant was not on twenty-four hour call, and was free to absent himself from the premises after scheduled working hours without notifying management. She made the additional finding that while the claimant was occasionally called upon to lend assistance outside normal working hours if in his apartment when an emergency occurred, he was not required to live on the premises as a condition of employment.

On the issue of liability, the examiner held that even assuming the injury had occurred as the claimant alleged, it did not occur in the course of his employment, and concluded that simply because claimant resided in the apartment where the injury occurred, such injury did not arise "in the course of his employment." The examiner entered an order denying Mosley's claim for worker compensation. On administrative appeal by Mosley, the Director of the agency determined that the examiner's disputed findings of fact were supported by substantial evidence and affirmed the conclusions and order rejecting the claim.

## III

In reviewing the challenged order, we are satisfied that the underlying findings of fact are supported by substantial evidence, and hence, should be permitted to stand. *Dell v. District of Columbia Department of Employment Services*, 499 A.2d 102, 107 (D.C.1985); *Hyman Construction Company v. District of Columbia Department of Employment Services*, 498 A.2d 563, 566 (D.C.1985). Thus, we are dealing with a situation in which the claimant was neither working nor required to be working when the injury was incurred.

■ Petitioner does not seriously dispute these findings, but contends that because the injury occurred within the confines of the apartment provided him as living quarters by his employer, his injury was compensable. We have held that in order to receive worker's compensation, claimant's injury must both arise out of employment and occur within the course of employment to qualify under D.C.Code §§ 36–301(12), –303 (1988 Repl.). *Grayson v. District of Columbia Department of Employment Services*, 516 A.2d 909, 911 (D.C.1986).

According to petitioner, the agency erred as a matter of law in holding that these requirements were not met, pointing out that the apartment was furnished to him rent-free because it suited the convenience of the employer to have him there should an emergency occur in which a maintenance helper was needed. He cites, *inter alia*, a New Jersey case, *Doe v. St. Michael's Medical Center of Newark*, 184 N.J.Super. 1, 445 A.2d 40 (N.J.1982), in which a hospital employee, attacked and robbed in a room leased to her by the hospital, sued her employer for failing to provide security. The suit was dismissed on the ground that plaintiff had a remedy under the state worker's compensation act on the premise that her injury arose out of, and in the course of, her employment.

It should be noted, however, that this decision was not made in the exercise of judicial review of an administrative body. In this jurisdiction, when an agency action is assailed on the ground of erroneous statutory construction, our approach to the issue is significantly deferential to the agency. *E.g., Remin v. District of Columbia Rental Housing Commission*, 471 A.2d 275, 279 (D.C.1984). "An agency interpretation of a statute that it administers and enforces is controlling, unless it is plainly wrong or inconsistent with its legislative purpose." *Id.; accord, McMullen v. District of Columbia Police and Firefighters Retirement & Relief Board*, 465 A.2d 364, 366 (D.C.1983).

■ Thus, to succeed in his contention that an injury suffered in off-duty hours in an apartment provided him rent-free by his employer is a compensable injury, petitioner must demonstrate that the agency's in-

terpretation of the statute in this case was plainly wrong or not in conformity with legislative intent. In our opinion, petitioner has failed to do this. The challenged interpretation here accords with the weight of authority, according to Larson's authoritative treatise.[3] In dealing with claims by a worker who has the option of living on or off premises, the author observed:

> When residence on the premises is merely permitted, injuries resulting from such residence are not compensable under the broad doctrines built up around employees required to reside on the premises. This distinction has been applied when the source of injury was the burning of the bunkhouse, tent, or other residence furnished by the employer, a fall from a porch, a fall down stairs, injury going toward or coming from the residence, electrocution, collapse of the hut in a high wind, destruction of a trailer by a tornado, and various other hazards not directly associated with the employment. The theory is that when residence is mandatory, it is the constraints and obligations of the employment that subject the employee to the risk that injured him, while if the residence is optional, the employee is free to do as he pleases and there is no continuity of employment obligation of any kind during the time the employee is voluntarily sleeping in a place provided for his convenience by the employer.

1A, A. LARSON, *supra* note 3 (footnotes omitted).

Some courts have made an exception to this rule, where the employer's premises are so remote from other places of habitation, that the worker has little practical choice other than to accept the living quarters his employer offers him. *See, e.g., Hunley v. Industrial Commission*, 113 Ariz. 187, 549 P.2d 159 (1976) (off-duty injury on steps of company building on south rim of Grand Canyon); *Aubin v. Kaiser Steel*, 185 Cal.App.2d 658, 8 Cal. Rptr. 497 (1960) (death incurred while leaving dormitory in remote desert area). The LARSON treatise upholds as the "better view" decisions granting compensation where there may be "no reasonable alternative ... in view of ... the lack of availability of accommodations elsewhere."[4] In the *Doe* case, *supra*, 445 A.2d at 43, the New Jersey court recognized this particular exception as relevant to compensability, remarking "petitioner, new to the area, may have had little alternative in Central Newark to this modest-cost dormitory housing provided by her employer." *Id.*

Plainly, this exception to the general rule has no application to this case before us. The record does not indicate that claimant Mosley had any difficulty in the first few weeks of his employment in commuting to work from his own place of residence. He testified that the reason he accepted his employer's offer to furnish him a place to live on the premises was because he "wanted an apartment by himself."

It is true that in certain jurisdictions, compensation has been awarded because of injury's occurring in facilities provided by employers, even though the claimant was not required to live there. Petitioner has cited some of these decisions and urges us to follow them.[5] In none of these cases, however, did the quarters provided the claimant consist of a separate apartment in the confines of which the tenant was free to do as he pleased. Moreover, the injuries occurred in places like common stairways, entrance steps, and other areas not exclusively within the sole control of the claimant.

Thus, we perceive no grounds for holding that the challenged construction of the statute by the agency entrusted with its administration was either plainly wrong or at odds with the legislative purpose.

*Affirmed.*

---

3. *See* 1A. A. LARSON, THE LAW OF WORKMEN'S COMPENSATION, § 24.40 (1984).

4. LARSON, *supra*, § 24.40 at 5–248.

5. The cited decisions, all upholding state agency awards, were *Gilbert v. Maheux*, 391 A.2d 1203 (Me.1978); *Kilcoyne's Case*, 352 Mass. 572, 227 N.E.2d 324 (1967); and *Sullivan's Case*, 265 Mass. 463, 164 N.E. 392 (1929).